## STATE EX REL. PIGOTT, APPELLANT, v. BENTON, RESPONDENT.

[Argued April 11, 1893.  Decided September 5, 1893.]

PRACTICE—*Nonsuit.*—Upon a motion for a nonsuit that which the evidence tends to prove will be considered as proved.

ELECTIONS—*Evidence—Certificate of nomination.*—A certificate of nomination to an office by a political party, regular on its face and filed with the proper officer as required by section 4 of the Montana ballot law (act of March 12, 1889), is a *prima facie* evidence of the nomination of the person whose name appears upon the official ballot as the candidate of that party.

SAME—*Same.*—Where a political convention delegated to a committee the power to nominate a candidate for an office, evidence by the secretary of such committee who certified such nomination to the proper officer, that he was not present at any meeting of the committee when a formal resolution was offered and a vote taken for the nomination of a candidate for such office; that he was present at a committee meeting when such candidate received the nomination, but could not name the particular meeting; that such meeting was held at several places, several committee-men being present; that several meetings were held at which such candidate's name was decided on, but no written minutes were kept, is insufficient to overthrow the *prima facie* evidence of the certificate of nomination. (HARWOOD, J., dissenting.)

SAME—*Convention.*—The Montana ballot law does not forbid a political convention from appointing and delegating to a committee power to make nominations for office, and a nomination made by such committee after the adjournment of the convention is in effect the act of the convention and therefore valid. (HARWOOD, J., dissenting.)

*Appeal from Eighth Judicial District, Cascade County.*

Action for usurpation of office. The cause was tried before ARMSTRONG, J., sitting in place of BENTON, J., disqualified. Judgment for respondent on nonsuit. Affirmed.

Statement of the case by the justice delivering the opinion.

This action is one for usurpation of office. The relator alleges and proves facts which he claims are sufficient for a judgment, to the effect that respondent is not entitled to the office of judge of the eighth judicial district of this state, and that relator is entitled to said office, and that he be put into possession of the same. (Code Civ. Proc., c. 5, tit. 10, §§ 410–417.) At the general election in November, 1892, the relator and the respondent were candidates, and received votes, for the office of district judge. The relator was regularly nominated for the office by the Democratic convention. His nomination was duly certified to the county clerk, and his name properly placed upon the official ballot as the candidate of the Democratic party. As such candidate he received votes. These matters were all regular, and as to them there is no contention. There is also no contention that respondent was regularly nominated by the Republican convention. His nomination was duly certified to the county clerk, and his name was properly placed upon the official ballot, and votes were given to him as such candidate. Respondent's name also appeared on the official ballot as candidate of the People's party. The official ballot, therefore, presented the following appearance:

District Judge, Eighth Judicial District.

Vote for one.

| | |
|---|---|
| Benton, Charles H., People's Party. | |
| Benton, Charles H., Republican. | |
| Pigott, W. T., Democratic. | |

At the election, Pigott, Democrat, received some 1,348 votes; Benton, Republican, 1,183; and Benton, People's party, 280.

Benton's vote, as Republican and People's party, together, gave him a majority over Pigott. If his People's party votes were not counted, he had not a majority over Pigott, and not a majority of all the votes cast and counted. The canvassing board counted for Benton his Republican and People's party votes. He was declared elected. He received his commission from the governor. He qualified as judge, assumed the office, and has been acting as judge down to the time of the commencement of these proceedings. The relator took the oath of office as judge, but has never acted as such. At his relation this action is commenced. He claims that respondent was not elected, but has usurped the office, and is now an intruder therein. Relator's whole case rests upon his attempted showing that the People's party votes cast and counted for Benton were illegal, and that they were illegal because Benton was not nominated by the People's party. Their alleged illegality rests upon the following facts: On September 3, 1892, the People's party convention was held. At the session of the convention no person was named by the convention as candidate for district judge. As to that office the minutes of the convention, introduced in evidence, show the following proceedings:

"McKay offered a motion of a vote of confidence in Judge Benton, of this district. Carried.

"County Committee:

"JEFF CAMPBELL.
"D. McKAY.
"HARRY DICKERSON. ⎫ Gt. Falls.
"S. PORTER.
"FRANK MARION.
"HARRY McLAUGHLIN. ⎫ Sandcoulee.
"JOHN GILLEN.

"Mtn. Present county com. be empowered to add to county central com. from other precincts. Carried. Mtn. County or executive committee be empowered by this convention to fill all vacancies that now exist, or may hereafter occur. Carried.

Mtn. to adjourn. Carried.

"G. L. WALES, Secty."

The case was tried before Hon. F. K. Armstrong, judge of the ninth judicial district, presiding upon the trial of the case,

without a jury. Upon the trial, the county clerk and recorder of Cascade county, being called as a witness, produced the People's party certificate of the nomination of Charles H. Benton, which was filed in his office, which is as follows:

"There being a vacancy on the ticket of the political party known as the 'People's party,' in the office of district judge, eighth judicial district of Mont., the executive committee of Cascade county of the People's party did, on the seventh day of October, 1892, nominate Charles H. Benton, residence, Great Falls, Mont., business judge of the eighth judicial disdistrict of Mont., address, Great Falls, Mont., for the office of district judge of the eighth judicial district of Mont. The nomination was made by the executive committee of said People's party, who were authorized to, and had the power delegated to them, to fill vacancies by the convention of said party, duly assembled and organized, and the cause of such vacancy in the office of district judge of the eighth judicial district was because such People's party convention did not nominate a candidate for such office. DANIEL McKAY, Chairman of the Executive Committee of the People's party.

Resides at Great Falls, Mont. Business, contractor. Business address, Great Falls, Mont.

"GEORGE L. WALES, Secretary of Executive Committee of the People's party. Residing in Great Falls, Mont. Business, harnessmaker. Business address, Great Falls, Mont."

George L. Wales, secretary of the executive or county committee of the People's party, was called as a witness by the relator. As to the nomination of Benton by the People's party, he testified as follows: "I am engaged in the harness and saddlery business. I reside at 405 First avenue, south, in the city of Great Falls. I was the secretary of the People's party convention held in Cascade county last fall, which nominated some men for county offices. Question. That was the only People's party convention held? Answer. That I was present at. Q. Will you answer the question? Was that the only People's party convention that was held? A. That I was present at. Q. I have asked you whether that was the only People's party convention held? A. So far as I know.

Q. Don't you know there was not another one held? A. I can't say. Q. You were here all the fall? A. Yes, sir. Q. You were the secretary of that convention? A. Yes, sir. Q. If another convention had been held, would you have known of it? A. I think I might. Q. Were you a member of the county committee that called it? A. No, sir. Q. Were you a member of the county committee that did appoint. A. No, sir. Q. Did the convention appoint a county committee? A. Yes. [Witness shown paper.] This paper contains the minutes of the convention. [Paper marked 'Exhibit B' for identification.] These minutes were written by myself, and at the time. No additions were subsequently made. I wrote them on two pieces of paper. I took down notes as we went along, and copied them on another piece of paper. Q. Was this the copy that you made? A. At the convention; at the time of the convention. Q. No proceedings were taken except those set forth in the minutes? A. That was the main points. Q. These were the nominations made so far as they were made, and the resolutions adopted so far as resolutions were adopted? A. Yes. I have seen the certificate of nomination which has been introduced in evidence, and which you now show me. [Witness shows the certificate of nomination already introduced in evidence.] This paper bears my signature as secretary of some executive committee. The executive committee consisted of Mr. McKay, myself, Mr. Porter, Mr. Campbell, and Williams. I believe they were the originals. Q. Of the executive committee? A. Yes. Q. By whom was the executive committee appointed? A. I do not know. That executive committee was not appointed by the county convention. Q. And you do not know by whom it was appointed? A. I was not present at the time, and I do not know by what authority the gentlemen named assumed to act as the executive committee, not being present at the time the committee was created. Q. Were you present at any meeting of the committee at which Judge Benton received the nomination? A. Yes, sir. Q. Where was that meeting held? A. At several places. Q. State the places. A. Sometimes one place, and sometimes another. The first was in the convention. Q. That was not the committee meeting. Confine yourself to this meeting of

the alleged executive committee that professes to have nominated Judge Benton. A. We met sometimes in McKay's office. Q. Who met at McKay's office, and when? A. I did not keep the dates; we met too often. We met at McKay's office as an executive committee. Mr. McKay, Campbell, Porter, and sometimes Holmes were present; at other times, different members. Q. I would like to know something about this particular time. A. I can't say. Q. Were you ever present at any meeting of the executive committee at which a vote was taken or resolutions adopted providing for the nomination of Judge Benton? and I will ask you next where it was, if there was such a meeting? A. No, sir. Q. Then it is a fact, or is it a fact then, that the information which you had which led you to sign this certificate of nomination concerning any action taken by the executive committee was conveyed to you by hearsay—that is, by some person who professed to be present? A. By the members of the committee. Q. Which members? A. McKay, Porter, and Campbell." Witness continuing: "I signed that document—this certificate—at the courthouse here in Judge Benton's office. McKay, myself, Holmes, and Judge Benton were present at that time. I can't say who prepared the document for execution. It was not prepared by Judge Benton in my presence. I believe that this meeting took place in Judge Benton's office, when this paper was signed, on the seventeenth day of October, which was the last day that the certificate could have been filed. I know that a certificate of nomination is required to be filed by law twenty days before an election, and this was the last day, as I figure it, upon which a certificate might be filed. Myself, Holmes, and McKay were present when it was signed, and we came to be present at the meeting. . Knowing that the nomination had not been put in, Mr. Holmes sent for me, and told me that the time was up, and we would have to put it in. Q. You came up there because Mr. Holmes called you? A. I expected to be called upon whenever the document was ready. I was notified by Mr. Holmes to come down with McKay. McKay came to the store after me. He dropped into the store, and told me to come up some time."

*Cross-Examination.*

"Question. You speak of the original committee, I believe, in reply to Mr. Shores, the executive committee. Was any-one added to that committee after the convention, and, if so, who was it? [Relator objects to the question as in-competent. No authority was given by the convention to make any change in its committees.] Answer. Mr. Holmes, who lives here in Great Falls. Q. Then I will ask you if Mr. Holmes was a member of that committee at the time of nomination of Judge Benton. A. He served as such. It is rather a difficult question for me to answer whether I had any notice to be at that meeting which nominated Judge Ben-ton, because we had so many meetings. I know of several meetings where Judge Benton's name came forward. Q. Was he nominated more than once? A. It was decided on several times. Q. You may state whether you were present at a meeting where it was decided that he should be the nomi-nee of the People's party. A. Yes, sir. Q. Who else was present? A. Mr. McKay, Porter, and Campbell. There may have been others around. I know we were there. I con-curred in this nomination, and signed the certificate.

*Redirect Examination.*

"It was reported to me that Holmes was added to the executive committee. I was not present at any meeting where he was appointed, or when anybody appointed him or added him. I do not know who had got added, except as somebody told me who had been added to the execu-tive committee. I was informed of it, and he served as such. That is all I know about it. I do not know who appointed him. I do not know whether McKay appointed him. There was a meeting one time, at which McKay, Holmes, and myself were present, at Dan McKay's office. I happened to go there because we had a regular—not a regular meeting, but an ir-regular meeting. I did not happen to be there. We went there for a purpose. We were notified by Mr. McKay. He met me on the street, and said, 'Come over to my office; meet-ing to-night.' That is all he said, and I understood it, and where the meeting was to be held, but I did not know what it

was for. I went down to McKay's office at that time. Question. How long was that before the certificate of nomination was made? Answer. From September 27th down to election day. Q. You were there all that time? A. No, sir. Q. I am asking you how long this meeting was held prior to the time of making this certificate of nomination. A. I cannot tell; there were so many meetings. Q. There is one particular meeting about which you have testified when you and three others were there. When was that held? A. I can't say. No minutes were kept. This was before the certificate was filed. Maybe two or three weeks, or it might have been a month, before. Q. Do you mean to say that you have no recollection upon the subject? A. No date. I can't tell the date. We kept no minutes of our meetings. The other business that we did was, we discussed finance. Q. Did you make up your minds to sell the nomination for the People's party? [Defendant objects to the question; that it is immaterial and irrelevant, and not an examination in chief.] Mr. Shores: I insist upon the question, and ask, further, did you at that time determine to sell the nomination, and fill in the nomination, including the office of district judge, clerk, and recorder, and so on? [Defendant objects further to the question, upon the ground that it is not justified by the pleadings in this case, and would be immaterial and irrelevant if foundation had been laid, which objection was sustained by the court, to which ruling of the court in sustaining said objection the relator then and there duly excepted at the time.] Witness continuing: Q. Who at that meeting, if anybody, proposed that Judge Benton be nominated for this office? A. I think the whole of them present spoke of it. Q. Was it at that meeting determined to nominate him? A. I can't say whether it was at that meeting fully determined. Q. Do you mean to say that at that meeting the subject was discussed, and favorably discussed? A. It was always favorably discussed. Q. Let us have a definite answer, if you can give it, to the question whether at that time and meeting held in Dan McKay's office—whether or not it was definitely decided to put Judge Benton in nomination. A. I can't answer that question. Q. Will you please refer to any other meeting at

which the propriety or advisability of nominating Judge Benton was under consideration? A. I can't name any individual meeting. Q. I take it that you are unable to point out any particular meeting at which it was determined to nominate Judge Benton? A. Yes, sir. Q. That you had in that and in various conferences over the matter favorable discussion—that is about the substance of it. A. Yes, sir. Q. And, on the day that this certificate was executed, you were requested by Dan McKay to come over to the courthouse, and did so, and affixed your signature to the certificate? A. Yes, sir. I came to the courthouse. This is about all that I know about the nomination of Judge Benton. After his appointment, Holmes acted with the committee as a member of the executive committee. I was present at several meetings where Mr. Holmes was."

The only other witness called by the relator was Judge Benton, the respondent, whose evidence is not material to the views expressed in the opinion below. Upon the close of the testimony for the relator, the court granted a motion for nonsuit, and entered judgment for respondent, and held that he was entitled to the office of judge. The relator appeals from that judgment.

*Ransom Cooper,* and *Arthur J. Shores,* for Appellant.

I.  Every question arising in the case at bar, with one exception, was determined by the supreme court of Montana in *Price* v. *Lush,* 10 Mont. 61, in favor of appellant. The one question remaining is embodied in the following proposition:

The committee of a party convention has no authority to nominate a candidate for public office unless the convention made an original nomination for that office, and a vacancy is occasioned by the death or declination of the nominee, or by the insufficiency of the certificate of the original nomination. No committee may be empowered to fill a vacancy left by a party convention.

That this is the law is clear, and is demonstrated to a certainty by sections 3, 4, 5, 11, 12, and 13, of the Act concerning Ballots and Voting, approved March 13, 1889. Section 2 provides the only methods by which nominations can be made.

These methods are three in number: 1. By a convention of delegates representing a political party; 2. By a primary meeting duly organized representing a political party or principle; 3. By electors to a certain number. Section 3 points out the method of certifying nominations made by a convention or primary meeting. Section 4 names the officer with whom the nomination shall be filed. Section 5 provides a means whereby nominations shall be made other than by a convention or primary meeting. When this method is pursued the certificate shall contain the same information as is required to be given in section 3, and shall be signed by not less than ten electors residing in the district, and when filed shall have the same effect as a nomination by a convention or primary meeting. This may properly be called the independent method. The candidate thus nominated is entitled to a place upon the official ballot as a candidate, but without any name or description appended. Section 11 prescribes how any one nominated in any of the three ways may decline the nomination. Section 12 is that upon which defendant relies for his nomination. In words whose meaning is susceptible of but one construction, it is therein provided: In case the person nominated, as in one of the three methods pointed out in sections 2, 3, 4, and 5, dies before the printing of the tickets, or declines the nomination as provided for in section 11, or in case the certificate of nomination be or become insufficient or inoperative, the vacancy thus occasioned, to wit, by declination or death, or the insufficiency of the certificate, may be filled in the manner required for the original nomination; that is to say, in one of the three ways specified. If the original nomination was made by a party convention which had delegated to a committee the power to fill vacancies, the committee acting for and representing the convention may, in power of the convention, upon the declination or death of the original nominee, or upon the certificate of his nomination being or becoming inoperative, fill the vacancy; the convention, acting through its special agent of limited and defined authority, may in such case make a substitute nomination, but only upon the occurring of the vacancy is the committee permitted to act. The certificate of the committee, in addition to other matters,

must set forth the name of the person for whom the new nominee is to be substituted, and the cause of the vacancy. No nomination was made by the People's party convention. There was neither death nor declination, nor did any original certificate become insufficient or inoperative, for the excellent reason that none was in existence. The paper claimed to be a certificate of nomination could not comply with the law; it did not state the cause of the vacancy, because no vacancy had occurred; it did not set forth the name of the original nominee for whom defendant was to be substituted, because no person had been nominated. While the statute is self-interpreting, authority is not wanting upon the question. No court has held to the contrary of the opinion given in *Lucas* v. *Ringsend* (S. D., Oct. 28, 1892), 53 N. W. Rep. 426. (See, also, *Price* v. *Lush,* 10 Mont. 61.)

II. Defendant was not *de facto* nominated by the committee. The record shows that he was not. It is in evidence that the certificate of nomination was executed in the presence of defendant and one Holmes by McKay and Wales. Neither Wales nor Holmes was a member of the county committee. The executive committee was supposed to consist of six members, including Holmes. This committee, it seems, was appointed by some person or persons unknown. It was not the county committee which alone had authority to add to the county central committee from other precincts only. Holmes lived in Great Falls precinct. So it appeared in evidence that, by taking either horn, defendant suffered impalement. If contending that the nomination was made by the county committee, it affirmatively appears that such could not be the case for three reasons: 1. One member only—to wit, McKay—took any part in such pretended nomination. Neither Wales nor Holmes was a member, nor could either be added to it; 2. The county committee did not even pretend or attempt to make the nomination, nor do the pleadings aver such proceeding, but the contrary; 3. At no time did that committee meet to consider the nomination. If contending that the executive committee made the nomination, as he must under his answer and the certificate, he is confronted with three reasons which effectually silence that pretense: 1. A subcommittee appointed

by the county committee was without right to nominate; 2. Conceding the power of this subcommittee to nominate, and conceding that Holmes was a member of it, yet a majority did not concur in the nomination of defendant; 3. It is clear the convention did not empower the executive committee to fill vacancies. It would seem to have used the words, "county or executive committee," as meaning the same body, using the words interchangeably.

III. Neither plaintiff nor relator is estopped from showing that the so-called nomination of the defendant by the executive committee of the People's party is void, nor has either waived any right in the premises. This question arose and was necessarily determined in *Price* v. *Lush*, 10 Mont. 61. If the ruling announced in that case was not satisfactory to the legislature, it would have been abrogated by statute. (*District of Columbia* v. *Woodbury*, 136 U. S. 450; *Sullivan* v. *City of Helena*, 10 Mont. 145.) In this state there seems to be little, if any, doubt of the right of the candidate to go on the ballot as often as he receives party nominations. (*Fisher* v. *Dudley*, 74 Md. 242; *State* v. *Stein*, 35 Neb. 848.) The sole effect of section 19 of our ballot law is to permit the correction of errors occurring in the publication of the names or descriptions of the candidates nominated for office, or in the printing of ballots, which corrections must be made by the certificates—that is to say, the published lists and ballots must be made to conform to the certificates. (*Bowers* v. *Smith*, 111 Mo. 45, 33 Am. St. Rep. 491.) Defendant contends that the power conferred by the section is judicial. We say that whatever power is given is ministerial only. If the power attempted to be conferred is judicial, the section to that extent is in conflict with the organic act limiting the jurisdiction of the probate court to certain matters, and is void. (*Ferris* v. *Higley*, 20 Wall. 375.) If the functions to be exercised be ministerial merely, the act was valid under the organic act, but must have been abrogated by the constitution, which defines the three departments of government and limits the powers of courts to things judicial. It was not the duty of the relator or the people to attack the void nomination by *mandamus* or prohibition before election.

There was present no element of estoppel; nothing has been

done or omitted to be done which the law demanded should not be done or omitted; no one has been misled, not even defendant, who had actual and full knowledge of all the proceedings whereby his name appeared upon the ballot as the candidate of the People's party. The nonaction of relator could not destroy the interest or right of the public. In sections 10, 15, and 17 of the ballot law are found provisions effectually disposing of this question. (*Johnston* v. *State*, 128 Ind. 16; 25 Am. St. Rep. 412.) See, also, as having a bearing upon the questions before the court, *Keller* v. *Toulme* (Miss., May 6, 1890), 7 So. Rep. 508; *Chateau* v. *Jacob*, 88 Mich. 170; *Shields* v. *Jacob*, 88 Mich. 164; *People* v. *Shaw*, 133 N. Y. 493; *State* v. *McElroy*, 44 La. Ann. 796; 32 Am. St. Rep. 355; *Talcott* v. *Philbrick*, 59 Conn. 472; *Fields* v. *Osborn*, 60 Conn. 544; *In re Vote Marks*, 17 R. I. 812; *State* v. *Black*, 54 N. J. L. 446; *West* v. *Ross*, 53 Mo. 350; *Ledbetter* v. *Hall*, 62 Mo. 422; *Gumm* v. *Hubbard*, 97 Mo. 311; 10 Am. St. Rep. 312; *State* v. *Frazier*, 98 Mo. 426; *State* v. *Minar*, 13 Mont. 1; *People* v. *Board etc.* 129 N. Y. 395.) A court of law ought not to be influenced or governed by any notions of hardship. Cases may require legislative interference, but judges cannot modify the rules of law. (*Rhodes* v. *Smethhurst*, 4 Mees. & W. 63; *West* v. *Ross*, 53 Mo. 350.)

*Leslie & Downing,* and *Berry & Tuttle,* for Respondent. *B. Platt Carpenter,* and *Preston H. Leslie,* of Counsel.

I. The objection of the relator should have been taken or made before the election. (Ballot Law of 1889, §§ 4, 8, 10, 15, 19; *Bowers* v. *Smith* (Mo., Nov. 9, 1891), 17 S. W. Rep. 762; *Allen* v. *Glynn*, 17 Col. 338; 31 Am. St. Rep. 304; Bigelow on Estoppel, 5th ed., 687; *People* v. *Waite*, 70 Ill. 25; *State* v. *Le Sueur*, 103 Mo. 253; High on Extraordinary Legal Remedies, § 631, citing *Regina* v. *Lockhouse*, 14 L. T. R., N. S., 359; *Bowers* v. *Smith*, 111 Mo. 45; 33 Am. St. Rep. 491; *Northcote* v. *Pulsford*, 32 L. T. R., N. S., 602; *Miller* v. *Pennoyer* (Or., Jan. 2, 1893), 31 Pac. Rep. 831; *Burgess* v. *Donaldson*, 22 Nova Scotia Rep. 155; *Regg* v. *Bradford*, 6 Ont. Pr. Rep. 304.) The question of estoppel did not enter

into the case of *Price* v. *Lush*, 10 Mont. 61, cited by relator. In that case only one nomination was made.

II.   If for every error of a county clerk or harmless irregularity in election proceedings, citizens having no control over either are to lose their rights of choosing public officers, the reform ballot act, instead of being an improvement of the machinery of popular government, will justly be denounced as "a snare to entrap the unsuspecting voter." (*Gumm* v. *Hubbard*, 97 Mo. 311; 10 Am. St. Rep. 312.)   When any particular construction which is given to an act leads to gross injustice or absurdity, it may generally be said that there is fault in the construction, and that such an end was never intended or suspected by the framers of the act.   (*People* v. *Board etc.*, 129 N. Y. 395.)   While it is well enough to insist upon a proper and strict performance of duty by officers conducting elections, we are not of the number of those who imagine that such performance will be promoted by disfranchising the whole body of electors in any locality, when errors such as are here charged occur.   The legislature has not plainly declared such a purpose, and we think it should never be imported into a statute by construction.   (*Bowers* v. *Smith*, 111 Mo. 45; 33 Am. St. Rep. 491.)   It is the duty of the courts to give to the statute a construction most favorable to its life and purpose, and not to give a forced construction, which would, under the statute, be unreasonable and unconstitutional.   (McCreary on Elections, 3d ed., 190–92; Cooley on Constitutional Limitations, 778; Sutherland on Statutory Construction, §§ 322, 323, 331, 332, 447, 452–54.)

All statutes tending to limit the citizen in his exercise of this right "of suffrage" should be liberally construed in his favor.   (*Owens* v. *State*, 64 Tex. 509.)   It is proper and often necessary to consider the effects and consequences of a proposed interpretation of a law to ascertain what is probably its true intent.   (*State* v. *Hope*, 100 Mo. 347.)

If the nomination of Judge Benton had been carried out with all the technical nicety desired by the relator, the result of the election would have been the same.   Irregularities which do not affect the final result, or, in other words, do not produce a different result from that which would have otherwise hap-

pened, are not vicious. (Brightly on Elections, 357; *Whipley* v. *McKune*, 12 Cal. 353; *Farrington* v. *Turner*, 53 Mich. 27; 51 Am. Rep. 88; *People* v. *Cook*, 14 Barb. 290; *Todd* v. *Steward*, 14 Col. 296; *Soper* v. *Sibley Co.*, 46 Minn. 274; *Lehlbach* v. *Haynes*, 54 N. J. L. 77; *Stinson* v. *Sweeney*, 17 Nev. 309; *Cleland* v. *Porter*, 74 Ill. 76; 24 Am. Rep. 273; *Piatt* v. *People*, 29 Ill. 72; *De Berry* v. *Nicholson*, 102 N. C. 465; 11 Am. St. Rep. 767.)

Innocent irregularities of election officers which are free of fraud, and which have not prevented a full and free or fair expression of the popular choice, will not vitiate the result of an election, unless the legislature has expressly so declared. (*Bowers* v. *Smith*, 17 S. W. Rep. 761; *Gumm* v. *Hubbard*, 97 Mo. 311; 10 Am. St. Rep. 312; *Davis* v. *State*, 75 Tex. 420; 6 Am. & Eng. Ency. of Law, 325; *Fowler* v. *State*, 68 Tex. 30; *People* v. *Schemmerhorn*, 19 Barb. 540.)

It is only those provisions of the statute relating to the time and place of holding elections, the qualification of voters and such others as are expressly made essential prerequisites to the validity of an election, that are held to be mandatory; all others are directory merely, and a failure to observe them, caused by honest ignorance and mistake, and not resulting in manifest fraud, does not afford ground for rejecting the entire vote of a precinct. But, on the other hand, it is equally well settled that neglect of directory provisions of a statute designed to prevent fraudulent voting, followed by actual fraud of a character sufficient in extent to throw doubt on the result of the election, is ground for rejecting the vote of a precinct if there is no means of purging the poll. (*Russell* v. *McDowell*, 83 Cal. 77; *Stinson* v. *Sweeney*, 17 Nev. 309; *Contested Election of E. R. Wheelock*, 82 Pa. St. 299.) The principle is universal that honest mistakes or omissions on the part of election officers, or irregularities in directory matters, even though gross, if not fraudulent, and there is no pretense of fraud in the case, will not avoid the election unless they affect the result. (*State* v. *Saxon*, 30 Fla. 668; 32 Am. St. Rep. 46; *McKinney* v. *O'Connor*, 26 Tex. 5; *Jones* v. *Caldwell*, 21 Kan. 186; *Dobyns* v. *Weadon*, 50 Ind. 298; *Lee* v. *State*, 49 Ala. 43; *Weaver* v.

*Given,* 1 Brewst. 140; *Farrington* v. *Turner,* 53 Mich. 72; 51 Am. Rep. 88, and cases cited.)

When the election is fair and honest, courts will not disfranchise the voters unless compelled to do so by the peremptory requirements of the law. (*Daly* v. *Petroff,* 10 Phila. 389; *Wells* v. *Taylor,* 5 Mont. 208; *Byrum* v. *Peterson,* 35 Neb. 237; *State* v. *Van Camp* (Neb., Jan. 17, 1893), 54 N. W. Rep. 116; *Lindstrom* v. *Board etc.,* 94 Mich. 467.) As to the irregularities of election officers, see *Wells* v. *Taylor,* 5 Mont. 208; *Wildman* v. *Anderson,* 17 Kan. 347; *Bowers* v. *Smith,* 111 Mo. 45; 33 Am. St. Rep. 491; 16 Lawyer's Rep. Ann. 754, note; *Preston* v. *Culbertson,* 58 Cal. 198; *People* v. *Bates,* 11 Mich. 362; 83 Am. Dec. 745; *Byrum* v. *Peterson,* 35 Neb. 237; *Allen* v. *Glynn,* 17 Col. 338; 31 Am. St. Rep. 304; *Weil* v. *Calhoun,* 25 Fed. 865. When the same party is on a ballot twice, it should be counted as a vote. (*People* v. *Holden,* 28 Cal. 137; Brightly on Elections, 267; *Behrensmeyer* v. *Kreitz,* 135 Ill. 591.)

III. It is contended that the committee of a party convention has no authority to nominate a candidate for public office, unless the convention made an original nomination for the office, and a vacancy is occasioned by death or declination of the nominee, or by the insufficiency of the certificate of the original nomination. The statute has failed to provide for just such an emergency as this, and we are inclined to think the legislature never intended to undertake to regulate the proceedings of nominating conventions in detail. They are left free to proceed in their own way. And we think they would have the power to meet in convention as was done in this case, nominate a part of its ticket, appoint a committee and authorize that committee by resolution to supply places left vacant by the convention, and we believe the committee, in obedience to this authority thus conferred by the convention, can supply such omissions, and when so done it is the original act of the convention putting the machinery in motion to carry out its will.

IV. Section 23 of article 5 of the constitution provides: "No bill except general appropriation bills and bills for the codification and general revision of the laws shall be passed,

containing more than one subject, which shall be clearly expressed in its title, but if any subject shall be embraced in any act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed."

Turning to the act of 1889 in question, we find it entitled, " An Act to Provide for Printing and Distributing Ballots at the Public Expense and to Regulate Voting at Territorial and Other Elections." So much of the law in question as relates to nominating conventions not having been expressed in the title of the act in question is void, otherwise plain language does not mean what it says. (*State* v. *Cantiney*, 34 Minn. 1; *Astor* v. *Arcade Ry. Co.*, 113 N. Y. 93; *Montgomery* v. *State*, 88 Ala. 141.)

De Witt, J.—As appears by the statement of the case above, the material point of the relator's contention was that respondent was not nominated by the People's party, and if not so nominated, the People's party votes cast for him were illegal votes, and he had not enough legal votes to elect him.

Upon a nonsuit, that which the evidence tends to prove will be considered as proved. (*Creek* v. *McManus*, *ante*, p. 152, and cases cited.) Did the evidence on the trial tend to prove that respondent was not nominated by the People's party? The name of Charles H. Benton as candidate of the People's party appeared upon the official ballot. (Ballot Laws, § 17, p. 139, 16th Sess., 1889.) That name so appeared because a certificate of nomination had been filed with the county clerk, and recorded. (*Supra*, § 4.) That certificate was signed by the chairman and secretary of the executive committee of the People's party. It is held that a certificate of election is *prima facie* evidence of the election of the person to whom the certificate is issued. (*State* v. *Kenney*, 9 Mont. 223.) By analogy we are of opinion that it should be held that a certificate of nomination, regular upon its face and filed with the proper officer, is *prima facie* evidence of the nomination of the person so certified. Therefore when it appeared, as it did, that such certificate of Benton's nomination by the People's party was executed and filed with the county clerk and recorder; that his name was thereupon placed upon the official ballot as candi-

date of the People's party; that he was voted for as such; that those votes so given him gave him a majority of all the votes cast; that he was declared elected by the canvassing board; that he was commissioned by the proper authority of the state; that he qualified as judge and· is acting as such, then I am of opinion that the relator entered upon this contest facing the *prima facie* evidence that respondent was nominated by the People's party. If respondent was nominated by the People's party, then there is an end of relator's case. Did relator's evidence overcome this *prima facie* situation; that is, did his evidence tend to show that Benton was not nominated by the People's party? The case went no further than relator's evidence. Benton was not yet before the court, on the trial, undertaking to combat testimony that he was not nominated. He was waiting for the relator to introduce evidence tending to show that alleged fact.

We will now look at the evidence to ascertain whether it tends to show that Benton was not nominated by the People's party. The district court held. that it did not, and hence the nonsuit. The only witness whom relator called to establish this point in the case was the acting secretary of the People's party executive committee, namely, George L. Wales. His testimony on this point is set out in the statement of the case above, in full, as it appears in the record. It seems that this committee, as created by the convention, consisted of seven original members, Campbell, McKay, Dickinson, and Porter of Great Falls, and Marion, McLaughlin, and Gillen of Sandcoulee. The committee was empowered to add to their number persons from other precincts. Holmes and Wales, each from Great Falls, and not from other precincts, became members of the committee, or acted as such, by some method not appearing. But if they were added to the committee without direct authority from the convention, I cannot understand that such action would destroy the life of the committee, or nullify the authority given it by the convention. Moreover, it does not appear that it was required that the secretary of the committee should be a member thereof. I cannot understand how, if the duly constituted members of the committee should act as authorized by the convention, their acts would be void by rea-

son of the presence of two or more persons who are not regular members of the committee, and who were not required to make a quorum or majority, which quorum or majority determined upon an act of the committee which was afterwards attacked. Now, it does not appear from the testimony that the nomination of Benton was made by a simple majority of the committee, of which majority Wales and Holmes were members. As will be plainly seen, there is no evidence that any member of the committee opposed Benton's nomination, and the evidence tends to show that all members of the committee favored the nomination.

What is the fair import of the tendency of Wales' testimony? It is true that Wales says he was not present at a meeting of the committee when a formal resolution was offered and a vote taken for the nomination of Benton. But many meetings were held, and no written minutes were kept. The witness says he was present at a committee meeting when Benton received the nomination; that such meeting was held at several places; that there were present McKay, Campbell, and Porter, who were original committee men, and, at other times, other members. He says that Porter, McLaughlin, and Campbell told him that Benton was nominated. This is criticised as hearsay evidence; but, whatever it is, it does not seem to me to be evidence tending to show that Benton was not nominated. Witness says he was present at several meetings "where Judge Benton's name came forward," and that his nomination was decided on several times, and that at one of these meetings Campbell, Porter, and McLaughlin were present, and there may have been others. He says he cannot tell how long before the making of the certificate the meeting was held at which Benton was nominated. There were so many meetings, and no minutes kept. He says that the whole of the committee present spoke of Benton's nomination. He cannot name the particular meeting at which he was nominated. There were various conferences and favorable discussions. No minutes were kept. Then, when the time had about expired in which certificates could be filed, McKay, chairman, and Wales, secretary, executed and filed the certificate introduced in evidence. I think that the fair conclusion from Wales' testimony is that

the committee, in an informal way, actually determined upon Benton's nomination. It was the general conclusion of the committee. The committee was small, and there was no necessity to proceed in the formal method of a large deliberative body, by resolution or motion and vote, and record of the same. We do not hear of an objection made at any time by any member of the committee to Benton's nomination. All that we can hear about the committee or any officer or member is that they favored and agreed to that nomination. Take all of Wales' testimony, direct, cross, and redirect, and examine it from the point of view of the situation of these committeemen, and the conclusion comes to my mind that the evidence rather tends to show that the committee did nominate Benton. I say rather tends to show, but let there be no misunderstanding on this point. I am not required to reach that conclusion from the testimony in order to support the action of the court below, and do not pass upon such conclusion. All that I need to observe is that the testimony does not tend to show that the committee did not nominate Benton. Of that I am altogether satisfied. There were several members of the committee besides Wales. If it were true that the committee did not nominate Benton, that was a fact within the knowledge of the members of the committee. But none of them were called as witnesses, and it was not shown that any effort was made to procure their attendance. Relator rests upon the testimony of Wales, and that testimony, I cannot doubt, did not tend to show that the committee did not nominate Benton. Therefore, there being a *prima facie* showing that the committee nominated Benton, and that *prima facie* situation not being overthrown upon the trial, we arrive at this point: The committee did nominate Benton. Then, did that nomination and the certificate to the county clerk entitle Benton's name to go upon the official ballot as the candidate of the People's party? That is to say, the matter reduces itself to one inquiry: Was that nomination of Benton, as it was made, a valid one, under the Montana ballot law?

The appellant argues that under section 12 of the ballot law the committee had no authority to fill the vacancy in the position of candidate for district judge, for the reason that no

original nomination for district judge had been made by the convention, and that such a committee can fill a vacancy only when such vacancy occurs from one of the causes mentioned in section 12—a vacancy by reason of there being no original convention nomination not being a vacancy contemplated by section 12, to be filled by a committee. The contention over this point has been very earnest, and very ably conducted, but I do not consider that the People's party nomination of Benton need be here tested by the provisions of section 12; that is, this nomination was not a substituted nomination, under section 12, but was rather an original one, made by the convention of the People's party. Whatever may be said in terms, in the pleadings or the evidence, to the effect that the convention did not nominate Benton, is not of importance. We may take all the facts before us, either admitted by pleadings or proved, and determine whether those facts may be properly construed as a nomination by the convention; that is, whether the act of the committee was, in effect and substance, the act of the convention. I am of opinion that such is the case. Suppose a political convention met, and there was before it the nomination of candidate for district judge. The convention appoints a committee to make the nomination. That committee retires. It returns to the convention, and reports that it decides to nominate Charles H. Benton. The convention receives the report, and adopts and ratifies it. Such nomination would certainly be the act of the convention, and the nomination would be the nomination of the convention. Such supposititious case differs from the facts in the case before us in only one particular: Instead of the convention ratifying the act of the committee after it was done, as above illustrated, it, in the actual case before us, ratified the act of the committee in advance, and did so expressly.

It gives the committee power "to fill all vacancies that now exist or that may hereafter occur." The vacancy in the position of candidate for district judge did "now exist" at the time of passing the resolution empowering the committee to make such nomination; for the convention had not named, and did not name, a person for district judge, except as it delegated power to name one to the committee. The conven-

tion represented the voters of the People's party. The convention had authority from the political organization known as the "People's party" to nominate a candidate for district judge. Instead of making that nomination in convention assembled, it made it through its delegated agent—the committee. What it was authorized to do it did in one way rather than another. I am of opinion that the Montana ballot law does not attempt to prescribe rules of order and procedure for political conventions. If it did, it would be a decidedly large undertaking. It is a matter of common knowledge that political conventions frequently operate just as this convention did; when it may seem not expedient at the session of the convention to make one or more nominations in the list of offices to be filled. The convention therefore leaves that duty to a committee selected by the convention, the committee having the trust and confidence of the convention, and the convention having the trust and confidence of the members of the party who elected it. I am not ready to conclude that the Montana ballot law intended to forbid conventions from operating in this manner by a selected committee.

Nor can it be contended that a political convention is inhibited by any organic law from delegating power to a committee. Why can it not do so? No answer to that inquiry presents itself to me. Such a convention is not, like a legislature, controlled by a constitution. It is not, like a municipal corporation, controlled by a charter. It is not, like a business corporation, created and governed by the law incorporating it. It is not a body bound by any organic law, like legislature, municipality, or business corporation. Therefore, rules as to the delegation of power, in my opinion, have no application to a political convention. I am not able to see any argument or reason why such a convention may not, if it pleases, do through a committee what it has power to do by itself. " *Qui facit per alium, facit per se.*" I am therefore of opinion that the nomination of Benton by the executive or county committee created by the People's party convention, and by that convention delegated the power to make the nomination, was, in substance and effect, a nomination by the convention. I therefore arrive at this result: The People's party convention nomi-

nated Charles H. Benton, the respondent. His nomination was certified to the county clerk and recorder. His name was properly placed on the official ballot. The votes cast for him as Republican and as People's party, together, gave him a majority of all the votes cast. He was therefore elected judge of the eighth judicial district, and the judgment of the district court should be affirmed.

This case is full of interesting and perhaps difficult propositions in reference to the construction of the ballot law of this state. The view taken above renders unnecessary the discussion of those points. The decision in this case is placed solely upon the ground discussed hereinbefore, and all other questions are reserved.

*Affirmed.*

PEMBERTON, C. J., concurs.

HARWOOD, J. (*dissenting*). My judgment is persuaded by careful consideration of this case that the decision just announced therein by a majority of this court is contrary to that demanded by the law and the evidence.

The law receiving construction and application as to its bearing in the regulation of conduct, is that recently adopted legislation concerning the manner of conducting general elections of public officers by the people of this state. This law, like many other legislative measures, comprises several prominent features, dependent upon one another in effectuating the purpose aimed at, and without the aid of either of which provisions the entire scheme would be weakened at least; or might fail altogether in the accomplishment of the purpose manifestly intended by its enactment. Thus, the legislature, to accomplish the purpose intended in the enactment of the statute under consideration, made provisions:

1. For the registration of legally qualified voters, whereby the disqualified who wrongfully seek to interfere in elections, and overcome the will of the *bona fide* citizens, are excluded.

2. Plain, reasonable, and just provisions for certifying to a public officer, nominations made by political parties, or by the requisite number of individuals concurring together; and the printing and delivery of an official ballot to each elector at

the polls, truly setting forth the nominations thus made, whereby (if such provisions are enforced) the elector is assured that the ballot thus placed in his hands truly expresses nominations, made, in fact, as represented therein; and thereby excludes false ballots devised to deceive, or detect the manner in which the elector exercises his suffrage.

3. Provisions which secure to the elector at the polls an opportunity for the free and independent expression of his will, by excluding from him the interference of agencies intended to coerce, unduly influence, deceive, or intimidate him in the exercise of his elective franchise.

The provisions of the statute plainly indicate that those objects, together with provisions to insure the honest counting and canvassing of the votes after the same have been cast, were mapped out in the legislative mind as necessary and concomitant features of the scheme of reform intended to be worked out by the legislative enactment; and the provisions of the statute are directed plainly to the accomplishment of those results. It is also apparent that to weaken or destroy the force or effect of either of those prominent features of the statute, by failing to give force and effect to the provisions enacted to accomplish such results, would derange and weaken, if not render abortive, the entire purpose of the law. While, on the other hand, a firm enforcement of its plain, reasonable, and just provisions, in no manner abridges, but insures the greatest freedom, safety, and certainty in the exercise and ascertainment of the will of the people, expressed through the ballot; because the law merely insists on truth and fidelity in respect to those conditions represented to the voter by the ballot, and demands the exclusion of agencies calculated to hinder, coerce, deceive, or intimidate the elector in the free and independent exercise of his will. It is in no manner a bold proposition to affirm that the people, with unanimity of sentiment, including all political parties, earnestly desire the firm maintenance of the plain intendment of this law by a just and reasonable enforcement of its provisions. For it was a measure of reform, demanded with emphasis, by a common sentiment and purpose on the part of the people to protect those precincts where the noblest and most sacred function of citizenship is exercised,

from the influence of corruption, coercion, deception, and fraud hitherto attending elections—a sentiment also shared by the people of many sister states, as manifested by recent legislative enactments. And the statute was received with general and unmistakable manifestations of approval by the people, as shown in the express sanction of provisions of that character, by a clause inserted in the constitution adopted by the people soon after the statute was enacted (Const., art. IX.); and by the further fact that several legislative sessions have convened since the adoption of this measure of reform, and one since the delivery of an opinion of this court in an important case, firmly maintaining a reasonable construction and enforcement of its provisions (*Price* v. *Lush*, 10 Mont. 61, a case directly bearing upon the questions here involved), yet the legislature has not interfered to remove or change the effect of those statutory provisions. And by virtue of this statute so upheld, a multitude of evil practices hitherto exercising a powerful and dangerous influence on elections have disappeared.

In the present case the inquiry is whether the provisions of this statute were observed in respect to placing the name of respondent on the official ballot as representing a nomination made by the People's party. His name was inserted in the official ballot once as the nominee of the Republican party for judge of said judicial district, and there is no contention as to the regularity of that nomination. But his name was again inserted in the official ballot as the nominee of the People's party, and as to this it is complained that it was done in disregard of the statute and without any such nomination in fact having been made.

It appears to be conceded that if respondent's name was inserted in the official ballot as such nominee, without the sanction of a nomination by such party, but in disregard of law and fact, then there is ground for complaint by the people, as instituted in this proceeding, and respondent would not be entitled to the fruits flowing from such a pretended nomination wrongfully inserted in the ballot. Such must necessarily be he'd, for to hold the contrary would operate practically to repeal or ignore or refuse effect to several sections of the statute; and such was the holding in *Price* v. *Lush*, 10 Mont. 61, a

case concurred in but not mentioned · by the learned judge in delivering the majority opinion in the present case, although that case was forcibly pressed upon the attention of the court in the consideration of this.   Nevertheless, the very retention and consideration of the present case necessarily involves the tacit holding that a good cause of action is stated.   And that cause of action lies wholly in the proposition set forth in the complaint that Mr. Benton's name was inserted in the official ballot as the nominee of the. People's party without the sanction of a nomination by that party.   If, in the opinion of the court, a good cause of action was not stated, the case should have been dismissed for want of a complaint well founded in law and fact; but the court does not go directly to such a determination.

Much discussion is gone into in the opinion of the court to deny that ·it was the intention of the legislature in enacting the law under consideration to interfere with the action of political parties in making nominations or otherwise.   This would seem to be labor in vain, for no one has insisted on any such proposition in the case, and such an intent seems to be entirely foreign to the terms, provisions, and object of the law in question. According to unquestioned history, it has, from time immemorial, been the habit of citizens to organize in political parties, including those of kindred views, and through such method as the party may adopt, ascertain and declare its will in the nomination of persons for public office or concerning public policy or the conduct of public affairs.   In this manner the citizen, by immemorial custom, undertakes to exercise the unquestioned right of making his will known and felt, respecting public affairs.   And the very genius of our form of government emphasizes that right, and all its history demonstrates its freest exercise.

The legislature, in framing the statute regulating elections, in its wisdom took into account those customary methods employed by the citizen and, leaving those privileges untouched, merely provides that when a political party does take action through a primary meeting of its electors or a convention of its delegates in an organized assemblage (Laws of 1889, § 2, p. 135), which results in the nomination of a person for elec-

tion to a public office, the same must be certified in a certain convenient manner prescribed, to a designated public officer, to be made known to the voter through the official ballot as the nomination of such party. The party is left by the legislature entirely free to act to the fullest extent that it may in its wisdom desire, through a convention of its delegates or a primary meeting of its electors. But having left such ample room for party action, the legislature did so provide that no other individuals or committees outside of the organized convention of delegates, or primary assemblage of electors of the party, can propose a nomination which will be recognized and published to the voter in the official ballot, as that of a political party, except only the subordinate and secondary action of a committee in filling a vacancy occurring in cases where the party had made an original nomination, which has become vacant by death, declination, or the ineffective condition of the original certificate of nomination. This the statute so plainly prescribes, both in its direct terms and also by reiteration, that no one has ventured, in this consideration, to bring those provisions into view, and deny that such is the effect thereof. The provisions upon this point are found in sections 2, 3, and 12 of the act, as follows:

"SEC. 2. Any convention or primary meeting, as hereinafter defined, held for the purpose of making nominations to public office, and also electors to the number hereinafter specified, may nominate candidates for public office to be filled by election within the state. A convention or primary meeting, within the meaning of this act, is an organized assemblage of electors or delegates representing a political party or principle."

"SEC. 3. All nominations made by such convention or primary meeting shall be certified as follows: The certificate of nomination, which shall be in writing, shall contain the name of each person nominated, his residence, his business, his business address, and the office for which he is named, and shall designate in not more than five words the party or principle which such convention or primary meeting represents, and it shall be signed by the presiding officer and secretary of such convention or primary meeting, who shall add to their signatures their respective places of residence, their business, and business

addresses. Such certificates made out as herein required shall be delivered by the secretary or president of such convention or primary meeting to the secretary of the territory or to the county clerk, as hereinafter required."

"SEC. 12. Should any person so nominated die before the printing of the tickets, or decline the nomination as in this act provided, or should any certificate of nomination be or become insufficient or inoperative from any cause, the vacancy or vacancies thus occasioned may be filled in the manner required for original nominations. If the original nomination was made by a party convention which had delegated to a committee the power to fill vacancies, such committee may, upon the occurring of such vacancies, proceed to fill the same. The chairman and secretary of such committee shall thereupon make and file with the proper officer a certificate setting forth the cause of the vacancy, the name of the person nominated, the office for which he was nominated, the name of the person for whom the new nominee is to be substituted, the fact that the committee was authorized to fill vacancies, and such further information as is required to be given in an original certificate of nomination. The certificate so made shall be executed in the manner prescribed for the original certificate of nomination, and shall have the same force and effect as an original certificate of nomination. When such certificate shall be filed with the secretary of the territory he shall, in certifying the nominations to the various county clerks, insert the name of the person who has thus been nominated to fill a vacancy in place of that of the original nominee. And in the event that he has already sent forth his certificate he shall forthwith certify to the clerks of the proper counties the name and description of the person so nominated to fill a vacancy, the office he is nominated for, the party or political principle he represents, and the name of the person for whom such nominee is substituted." (Sess. Laws, 1889, pp. 135, 136, 138.)

We are bound to give effect to the plain intent of the statute, and here the intent is so plainly manifest there is no room for interpretation, nor room for controversy that, according to the statute, the committee, in its subordinate sphere of action, must wait for the "occurring of such vacancies" in the "origi-

nal nomination" made by the party that appointed and empowered the committee to act in such event. The wisdom of the legislature in making this provision is manifest, and has been, and no doubt in the future will be, demonstrated. It protects political parties and electors alike. The very will and purpose of the party may be manifest by its omission to make nominations in certain cases. If I mistake not as to the course of recent events, this was notably illustrated in respect to a judicial office in the northern district of this state, and perhaps elsewhere, at the last election. But whatever may have been the reasons which moved the legislature to so frame said statute, the provision is nevertheless too plain to admit of disputation. The legislature did not so provide as to put it into the power of a small subordinate committee to reverse the purpose or policy of the party by independent original action. After inviting and providing for the insertion of all nominations in the official ballot, which any party may see fit to make through a "convention or primary meeting" of its party representatives, the law provides: "*Should any person so nominated* die before the printing of the tickets, or decline the nomination, as in this act provided, or should any certificate of nomination be or become insufficient or inoperative from any cause, the vacancy or vacancies thus occasioned may be filled in the manner required for original nominations." And proceeding, the section provides that: "If the original nomination was made by a party convention which had delegated to a committee the power to fill vacancies, such committee may, *upon the occurring of such vacancies, proceed to fill the same.*" Could language be more explicit or the intention be more plainly expressed? It would seem not, except by reiteration, and the legislature in that way in the same section does explain its intention even more plainly, for in providing for the certificate of such nomination by the committee to fill the vacancy, the law prescribes that the certificate "shall set forth the cause of the vacancy, the name of the person nominated, the office for which he was nominated, *the name of the person for whom the new nominee is substituted.*" This could not be done where there had been no original nomination, and thus the committee undertaking to make original nominations would plainly observe that such

action was exceeding its province under the provisions of the law; and that, failing to comply with the statute, such action of the committee must be disregarded, or the law must be disregarded, in making and publishing the official ballot. This was an important question of law, ably pressed upon the consideration of the court by counsel for the people as bearing directly upon this case, because it was a fact admitted that a general convention of the People's party for the county comprising the judicial district in question was held, and made and certified certain nominations for offices to be filled at the ensuing election; but such convention did not nominate respondent or any other person for the office of judge of that judicial district. However, through certain actions of respondent and others (which will be examined below), the name of respondent was inserted in the official ballot as the nominee of the People's party.

But notwithstanding the law and the facts, what has the majority of this court determined by the judgment announced? The majority have determined that the committee may proceed to make original nominations in respects wherein the party convention was silent; and that it is proper for the county clerk, as a public officer, acting under the statute in this important matter, to receive and give effect to a certificate, filed by such committee, which does not, and could not, fulfill the requirements of the statute. By what process of treatment this extraordinary conclusion is reached, must be sought in the majority opinion. I have looked earnestly and carefully there, but fail to find the law brought into view, and discussed, or its provisions even referred to in the opinion.

The effort to make out that the committee in this case acted as if in the convention, and with the convention's ratification, cannot be maintained with even a specious show of reasoning, without doing violence to the distinction of terms used in the statute. In that way all law can be ignored, and any conclusion reached. There was a convention. This is admitted. The convention took such action as it desired, and dissolved. It appointed a committee—just such a committee as the statute describes—and that committee, and the alleged action thereof, long after the convention adjourned, is under consideration in

this case. The statute defines and describes the convention, and also the committee, and provides in plain terms what action of such committee would be recognized, and published in the official ballot, as the action of a political party. But the law—the statute relating to this important subject—appears not to have been discussed. Indeed this peculiar feature of the opinion seems to have strongly impressed its author, for the questions of law involved in the case are disposed of with the observation, which I quote from the opinion as submitted to me, that: "This case is full of interesting, and perhaps difficult propositions in reference to the construction of the ballot law of this state. The view taken above renders unnecessary the discussion of those points. The decision in this case is placed solely upon the ground discussed hereinbefore, and all other questions are reserved."

I do not find the lids of the statute book so unyielding, nor so unnecessary to be tried; nor its contents when opened, so "difficult" and mysterious.

No less remarkable, however, it seems to me, is the determination of the court in reference to the testimony introduced in the case, as shown by the record. The certificate of nomination, showing its failure to comply with the requirements of the statute, was exhibited in the complaint by copy. This certificate, the majority of the court hold, is *prima facie* evidence that respondent was nominated by the People's party as candidate for judge of that district. No greater faith could, under the rules and principles of law universally acknowledged, be given to such certificate if it complied with the requirements of the statute. But without even noticing its infirmity in that regard, so plainly pointed out and urged by relator, the court sets this certificate down as *prima facie* evidence of such nomination.

Now, granting for the further examination of the case, that this certificate is, at the commencement of the trial, *prima facie* evidence of such action of the committee. That faith and credit and consequent weight is given to such certificates because the law has delegated and authorized persons to certify facts for public record, who, by reason of their direct personal contact with the action of the committee in pre-

siding over its deliberations and ascertaining and recording its express will, have come into personal knowledge of the facts certified; and on further presumption of the law that a person delegated and invested by law with power to discharge a solemn public duty, would not so certify without personal knowledge of the truth of the matter set forth.   Those are the reasons and presumptions which give the weight of *prima facie* proof to such certificates; and when the foundation of such presumption is removed by showing in the proper tribunal and proceeding that the certificate was made by the person appointed to certify, without personal knowledge that the matter certified was in fact true, thereby the certificate loses its *prima facie* weight, and is discarded as of no evidential weight.   If there were no cases on this point to cite, reason alone would seem to be sufficient to draw a court to that conclusion; for what is my certificate worth as evidence, if I certify that certain action has been taken without personal knowledge thereof?   What is such certificate worth as evidence to support the fact, if one having solemnly certified that such action had verily been taken, upon being called and questioned under the test of an oath, is compelled to admit over and over again that he was not a witness to the matter certified, and cannot, from the basis of such personal knowledge which every court would exact before admitting the witness to testify, say that the matter certified in fact took place.   Not only the simplest principles of evidence and reason discard such a certificate on that showing, in a case where the facts can be inquired into; but the authority of decided cases also confirms the proposition that such certificate should be cast out of consideration when the ground upon which faith and credit is given to it as *prima facie* evidence is removed by showing that it was certified without personal knowledge of the facts set forth.   The certificate of a notary public to the fact that demand of payment and protest for nonpayment of negotiable paper was made is *prima facie* evidence of that fact.   (Comp. Stats., sec. 1576, p. 1077; *Smith* v. *McManus*, 7 Yerg. 477; 27 Am. Dec. 522; *Browne* v. *Philadelphia Bank*, 6 Serg. &. R. 487; 9 Am. Dec. 463.)   But when it appeared that the notary certifying such alleged demand and protest did not so certify from his own knowledge, the certificate thereby lost its force

as *prima facie* evidence to support the fact that such presentation and demand was made. (*Hoff* v. *Baldwin*, 12 Mart. (La.) 699; 13 Am. Dec. 385; *Williamson* v. *Turner*, 2 Bay, 410; 1 Am. Dec. 652.) The court, observing of the notary's action in the latter case, that " his own knowledge of the fact will alone justify him in making up his protest, either to send abroad into foreign countries, or in inland transactions." It will not suffice to answer that the notary must personally make the demand, because such is not the law; the demand may be made by another in the presence of a notary. This is affirmed in the cases cited above, as well as numerous other cases. In those cases to impeach the certificate the notary who certified was called, and from his testimony it was ascertained that he certified without knowledge of the facts set down in the certificate, and such showing condemned the certificate as worthless to evidence the facts certified.

But how is the holding in the case at bar? By the opinion of the majority of this court the certificate is proclaimed as *prima facie* evidence of the nomination of respondent, and held as good enough to warrant judgment for respondent, although the one whom the law appoints and intrusts with the solemn duty of making a public record by certifying the nomination as secretary of the committee, is compelled under oath to acknowledge that he was not present at any meeting of said committee at which respondent was nominated as certified, nor could he state the time, place, or circumstances of any such nomination by the committee.

This brings me to the point where a reference to the evidence ought to be made, and must be made principally by quotation, wherever my view differs from a majority of the court as to what the evidence shows; for it is not my purpose, by contra-assertion, or negation, to dispute those conclusions set down in the opinion of the court, as to what the evidence shows, and on the strength of which the court proceeds to affirm that the evidence "tends to prove that the committee nominated respondent," as represented in said certificate. But let the witnesses be introduced to contradict those affirmations and conclusions by quotation of all they say as to their knowledge of the committee's action.

There is no dispute that a convention of the People's party was held at Great Falls, in and for said Cascade county, which comprises the judicial district in question; that nominations were made by said convention, but not of any candidate for district judge; that as shown by the minutes of said convention introduced in evidence, the convention appointed a "county or executive committee," consisting of Jeff Campbell, D. Mc-Kay, Harry Dickerson, S. Porter, Frank Marion of Great Falls; Harry McLaughlin, and John Gillem of Sandcoulee; that said "county or executive committee" was empowered to add members "from other precincts"; that Mr. George L. Wales was secretary of said convention, but was not appointed as a member of said committee; that said George L. Wales signed and certified the certificate which was filed in the office of the county clerk, representing that respondent had been nominated for the office of district judge, by said committee, as the nominee of the People's party.

Mr. Wales was called to the witness stand by relator, and having introduced the minutes of said convention, his testimony concerning the alleged nomination of respondent by said committee, in answer to questions forms the following dialogue:

Q. Were you present at any meeting of the committee at which Judge Benton received the nomination? A. Yes, sir. Q. Where was that meeting held? A. At several places. Q. State the places. A. Sometimes one place, and sometimes another. The first was in the convention. Q. That was not the committee meeting; confine yourself to this meeting of the alleged executive committee that professes to have nominated Judge Benton? A. We met sometimes in McKay's office. Q. Who met at McKay's office, and when? A. I did not keep the dates; we met too often. We met at McKay's office as an executive committee. Mr. McKay, Campbell, Porter, and sometimes Holmes, were present; at other times different members. Q. I would like to know something about this particular time? A. I can't say. Q. Were you ever present at any meeting of the executive committee at which a vote was taken or resolution adopted providing for the nomination of Judge Benton; and I will ask you next where it was, if there was such a meeting? A. No, sir.

Q. Then it is a fact, or is it a fact, then, that the information which you had which led you to sign this certificate of nomination concerning any action taken by the executive committee was conveyed to you by hearsay; that is, by some person who professed to be present? A. By the members of the committee. Q. Which members? A. McKay, Porter, and Campbell. [Witness continuing.] I signed that document—this certificate—at the courthouse, here in Judge Benton's office. McKay, myself, Holmes, and Judge Benton were present at the time. I can't say who prepared the document for execution. It was not prepared by Judge Benton in my presence. I believe that this meeting took place in Judge Benton's office, when this paper was signed, on the seventeenth day of October, which was the last day that the certificate could have been filed. I know that a certificate of nomination is required to be filed by law twenty days before an election, and this was the last day, as I figured it, upon which a certificate might be filed. Myself, Holmes, and McKay were present when it was signed, and we came to be present at the meeting. Knowing that the nomination had not been put in, Mr. Holmes sent for me, and told me that the time was up, and we would have to put it in. Q. You came up there because Mr. Holmes called you? A. I expected to be called upon whenever the document was ready. I was notified by Mr. Holmes to come down with McKay. McKay came to the store after me. He dropped into the store and told me to come up sometime.

### Cross-Examination by Defendant.

Q. You speak of the original committee, I believe, in reply to Mr. Shores—the executive committee. Was any one added to that committee after the convention, and if so, who was it? Relator objects to the question as incompetent; no authority was given by the convention to make any change in its committees. A. Mr. Holmes, who lives here in Great Falls. Q. Then I will ask you if Mr. Holmes was a member of that committee at the time of nomination of Judge Benton? A. He served as such. It is rather a difficult question for me to answer whether I had any notice to be at that meeting which nominated Judge Benton, because we had so many meetings. I know of several meetings where Judge Benton's name came

forward. Q. Was he nominated more than once? A. It was decided on several times. Q. You may state whether you were present at a meeting where it was decided that he should be the nominee of the People's party? A. Yes, sir. Q. Who else was present? A. Mr. McKay, Porter, and Campbell. There may have been others around. I know we were there; I concurred in this nomination and signed the certificate.

### Redirect Examination.

It was reported to me that Holmes was added to the executive committee. I was not present at any meeting where he was appointed, or when anybody appointed him or added him. I do not know who had got added except as somebody told me who had been added to the executive committee. I was informed of it, and he served as such; that is all I know about it. I do not know who appointed him. I do not know whether McKay appointed him. There was a meeting one time at which McKay, Holmes, and myself were present at Dan McKay's office. I happened to go there because we had a regular—not a regular meeting, but an irregular meeting. I did not happen to be there. We went there for a purpose. We were notified by Mr. McKay. He met me on the street, and said, 'Come over to my office; meeting to-night.' That is all he said, and I understood it, and where the meeting was to be held, but I did not know what it was for. I went down to McKay's office at that time.

Q. How long was that before the certificate of nomination was made? A. From September 27th down to election day. Q. You were all that time? A. No, sir. Q. I am asking you how long this meeting was held prior to the time of making this certificate of nomination? A. I cannot tell, there were so many meetings. Q. There is one particular meeting about which you have testified when you and three others were there; when was that held? A. I can't say, no minutes were kept. This was before the certificate was filed; may be two or three weeks, or it might have been a month before. Q. Do you mean to say that you have no recollection upon the subject? A. No date; I can't tell the date; we kept no minutes of our meetings; the other business that we did was, we discussed finance. Q. Who at that meeting, if anybody, proposed that Judge Ben-

ton be nominated for this office? A. I think the whole of them present spoke of it. Q. Was it at that meeting determined to nominate him? A. I can't say whether it was at that meeting fully determined. Q. Do you mean to say that at that meeting the subject was discussed, and favorably discussed? A. It was always favorably discussed. Q. Let us have a definite answer, if you can give it, to the question whether at that time and meeting held in Dan McKay's office, whether or not it was definitely decided to put Judge Benton in nomination? A. I can't answer that question. Q. Will you please refer to any other meeting at which the propriety or advisability of nominating Judge Benton was under consideration? A. I can't name any individual meeting. Q. I take it that you are unable to point out any particular meeting at which it was determined to nominate Judge Benton? A. Yes, sir. Q. That you had, in that and in various conferences over the matter, favorable discussion; that is about the substance of it? A. Yes, sir. Q. And on the day that this certificate was executed you were requested by Daniel McKay to come over to the courthouse, and did so, and affixed your signature to the certificate? A. Yes, sir. I came to the courthouse. This is about all that I know about the nomination of Judge Benton. After his appointment Holmes acted with the committee. I was present at several meetings where Mr. Holmes was."

This witness was called to impeach the integrity of said certificate of nomination, by showing that it was certified by him without knowledge as to whether its contents expressed truth or fiction; and as usual with an unwilling witness, or one desirous of making out exactly the opposite of that which he is called to prove, he starts out with an answer affirming that he was "present at a meeting of the committee which nominated Judge Benton"; and then with great circumlocution and evasion he shifts around the simple inquiry as to when and where said committee assembled, and who were present, and other pertinent inquiries; until finally he is compelled, in fidelity to his oath, to state that he was never present at any meeting of the executive committee "at which a vote was taken or a resolution adopted providing for the nomination of Judge Benton"; and again that, " it is a fact that the informa-

tion which led him to sign said certificate was the assertion of other members of the committee," and when asked to name them could name only three; that he was called to the court-house, and in Judge Benton's office, on the last day for filing such a certificate, in company with only one member of said committee, together with Judge Benton, and Holmes, who at the most only assumed to act as a member of the committee, and without eligibility, as known to the witness, because the committee was authorized to add members from other precincts only, and Holmes, according to the testimony of this witness, was a resident of Great Falls, and with no knowledge of any other nomination of Judge Benton by said committee, this wit-ness signed said certificate as secretary of the committee. Even under examination by respondent, this "secretary" of said committee, having said that he was present at a meeting of the committee "where it was decided he (Judge Benton) should be nominated" yet was unable to locate such meeting of the committee. And, again, under relator's redirect exami-nation, this witness shifts about the one simple question with many more evasive answers, and finally closes his testimony by repeated denials of any knowledge of such a nomination by said committee, in this wise: when asked "let us have a definite answer, if you can give it, to the question whether or not at that time and meeting held in Dan McKay's office, it was finally decided to put Judge Benton in nomination?" he replied, "I cannot answer that question." And, again, in answer to the question. "Will you please refer to any other meeting at which the propriety or advisability of nominating Judge Benton was under consideration?" he said, "I cannot name any individual meeting." And, again, to the interroga-tor's observation, "I take it that you are unable to point out any particular meeting at which it was determined to nomi-nate Judge Benton?" he replied, "Yes, sir." And, again, to the question, "And on the day this certificate was executed you were requested by Dan McKay to come over to the court-house, and did so, and affixed your signature to the certifi-cate?" he answered, "Yes, sir, I came to the courthouse. This is about all that I know about the nomination of Judge Ben-ton." Such are the flimsy and spurious pretenses upon which

said certificate is based, and such is the direct impeachment of its integrity as *prima facie* evidence of the facts it was made to record. Nevertheless, the majority of this court, in the light of such showing, are pleased to approve said certificate as good enough still, and to hold that such evidence " tends to prove that said committee did nominate respondent."

How does it support such views, to say that if Wales knew nothing about any such action of the committee, there was still another who signed said certificate as chairman of said committee, and that he was not called also to impeach the certificate? Surely the court would be consistent in its holding, and lay no harder rule on the chairman than on the secretary, whom the law had commissioned to certify to the action of the committee; and thus, if the chairman had been called, and exhibited the same determination to make out that the committee did make such nomination, and yet was forced repeatedly to admit that in .fact he knew nothing of any such action, the majority of this court, having held such want of information good enough on the part of the secretary, and that his certificate was still *prima facie* evidence, although he testified that he knew nothing about the facts certified, would also hold the same in respect to the chairman, yea, that such evidence " tends to show that the committee made such nomination."

It appears that respondent himself lent a little assistance in reference to his alleged nomination in question here. He was called to the witness-stand by relator, and his testimony is somewhat significant. He admits that he personally prepared said certificate representing his nomination by said committee. And also that he made the correction appearing in said certificate by interlineation. And further said: " I was not present at any other meeting of the executive committee prior to the time of the execution of the certificate of nomination, and have no knowledge of any previous meeting having been held. I had spoken I think with one or two members of the executive committee, or they had spoken to me, with reference to indorsing my nomination by the Republican party; I think Mr. McKay, and Mr. Campbell, I think, was the other."

This statement of respondent that he had " no knowledge of any previous meeting having been held," implies that he con-

sidered or pretended to consider the meeting at his office when said certificate was executed, a meeting of the committee, although only one member of the committee was present, with himself, Wales and Holmes, on that occasion. But those were there who had been called to respondent's office to sign said certificate, when the last hour for filing it was very near at hand. This coincides with Wales' testimony. They had to consider that a meeting of the committee, if they pretended that any meeting of the committee sanctioned the nomination certified, because they could not point to any other meeting whatever at which respondent was nominated.

This testimony of respondent shows too that he undertook the preparation of the document certifying his nomination, in advance of any knowledge that the committee had invited such action from him, or any one else, by conferring such nomination upon him. But without any such knowledge, according to his own testimony, he prepared the certificate, and the parties who signed it were summoned to his office on the last day for filing it, and under his tuition, he having corrected the certificate to conform to his idea of sufficiency, it was signed and filed.

Now no one pretends, in view of the real facts exposed on the hearing of this case, that said alleged meeting at Judge Benton's office was a committee meeting in any sense whatever. Therefore, if any such nomination was in fact made by the committee at all, it must have been at some meeting of the committee previous to the signing of the certificate; of which meeting even, much less nomination, neither respondent, nor Mr. Wales, "secretary," had knowledge; although the secretary testifies that he was there in Great Falls "all the fall," where a majority of the committee resided, and where it is pretended such meeting was held. Under these circumstances, should the secretary of a committee who is to certify its action for public record know of the meeting of the committee? Apparently not, according to the decision of this court. But consider the evidence a little further: Is it not a very singular and striking circumstance that respondent, who sought the nomination with such eagerness as to prepare his certificate of nomination, was, up to that late hour, entirely without knowl-

edge of an event of such usual and desirable notoriety as a political nomination for an elective office, through the action of a committee, if any such action had ever been taken at all. Is it not remarkable that the "tendency of the evidence" was not strong enough to bring such knowledge to one who sought the nomination with such anxious personal solicitude?—one living right where a majority of the committee resided, and where, as it is pretended, the meeting took place—and one sustaining such intimate personal relations with the principal actors in the transaction, as to have their meeting at his office, and to prepare for them the important document? Not only respondent was ignorant of any such action of the committee, but Mr. Wales, "secretary," so full of pretended knowledge of such meeting and nomination prior to the execution of said certificate, is compelled, repeatedly, to admit that he in fact had no knowledge that what he certified was true. The circumstances connected with the consummation of a transaction, or the execution of an instrument, are pertinent to be shown in evidence and considered (Code Civ. Proc., § 632), and always where the genuineness and integrity of the instrument is under inquiry. Confronted by such circumstances, no wonder respondent besought the court for the relief of nonsuit, to escape the embarrassment of attempting to produce proof showing that the pretended meeting and nomination by the committee actually occurred. The certificate of nomination had been clearly impeached, both in law and in fact. And, therefore, in my humble opinion, when the certificate upon which respondent hung his case as being *prima facie* evidence of his nomination, had thus been impeached, and lost all weight as evidence of the fact which it certified, nonsuit was clearly improper without considering further circumstances. But over and above that situation the strong tendency of the proof, and the circumstances proved, was to the effect that no such committee meeting or nomination as was certified ever occurred at all. All authority agrees that we must regard as proved what the evidence offered tends to prove, on considering the propriety of granting a motion for nonsuit. According to what has been shown, respondent was in a trying situation when he moved for nonsuit. If it had been denied, as

it should have been, because of the impeachment of the certificate, and the tendency of the evidence as showing that no such meeting or nomination ever occurred, respondent would have been compelled to abandon the case, or find proof to show the palpably improbable fact that a committee of a political party, alleged to have nominated him, held a secret meeting for such nomination, and guarded the secrecy of that event so carefully and successfully that not only respondent, but even the secretary of the committee, did not know of the meeting up to the time of filing said certificate on the last day fixed by law for filing the same. Where would respondent find evidence to prove such unnatural and improbable events? In the face of these exposures, which no doubt convinced respondent and his counsel that the committee had never adopted any such procedure, and consequently no such action could be proved, a motion for nonsuit was made. Under those circumstances respondent must have needed the relief of nonsuit to allow his escape from the contest. But in my opinion neither the law nor the facts warrant such decision.